IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ALYSHA ZIMMERMAN,

        Plaintiff,

v.

YEOMAN ASSET MANAGEMENT, LLC d/b/a Red Dot Storage,

        Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Alysha Zimmerman, by and through undersigned counsel, HKM Employment Attorneys, LLP, for her Complaint against Yeoman Asset Management, LLC d/b/a Red Dot Storage ("Yeoman" or "Defendant") states and alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an employment discrimination case arising from Defendant's discrimination against and wrongful termination of Plaintiff because of Plaintiff's pregnancy and request for and/or use of accommodations related to same, and retaliation against Plaintiff for discussing her wages.

### PARTIES AND JURISDICTION

2.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

1

3.      Plaintiff Alysha Zimmerman is, and at all times relevant to the Complaint was, a resident of Colorado.

4.      Defendant Yeoman Asset Management, LLC d/b/a Red Dot Storage ("Defendant" or "Yeoman") is a Delaware limited liability corporation, authorized to conduct business in Colorado.  Defendant has a principal office street address of 248 Centennial Parkway, Ste. 100, Louisville, Colorado 80027.

5.      Defendant has over 190 locations across 18 states, offering a wide range of storage options such as standard storage units and specialized climate-controlled units for sensitive and vulnerable items.

6.      Defendant has approximately 7.5 million square feet of storage space and greater than 58,000 storage units.

7.      Defendant has more than 100 employees.

8.      Plaintiff's employer, at all times relevant to the Complaint, was Defendant.

9.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. §§ 2000e-5(f)(3) and 28 U.S.C. § 1331.  This Court has jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims are so related to the federal claims that they form part of the same case or controversy.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as Defendants reside in this District and the events giving rise to this suit occurred in this District.

**ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED**

11.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

12.     Plaintiff filed Charges of Discrimination, Numbers 32A-2022-00038 and E2200013696 with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, against Defendant for discrimination and retaliation based on sex/gender and pregnancy and/or in retaliation for requesting and/or using reasonable accommodation related to the same on or around October 8, 2021.  Plaintiff was issued a Notice of Right to Sue with respect to the above Charge Numbers and has filed the instant action within ninety (90) days of receipt of same.

13.     Plaintiff has met all administrative prerequisites prior to filing this action.

## GENERAL ALLEGATIONS

14.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

15.     Plaintiff began working for the Defendant as a Customer Service Agent on or about March 14, 2017.

16.     Plaintiff was later promoted to a Coverage Supervisor position in the Customer Service Department.

17.     In or about November 2019, Plaintiff was promoted to a position of Integrations Project Coordinator on the Conversions and Integrations team.

18.     On or about January 2, 2020, Plaintiff received an Employee Performance Review from the Defendant, in which Defendant could rate Plaintiff as Excellent, Good, Fair, or Poor on 12 topics.

19.     In the review, Defendant rated Plaintiff as Excellent in 12/12 topics, and gave Plaintiff complimentary feedback, including:

a.  "Your productivity has helped the team significantly since your joining in November."

b.  "The quality of your work has so far been outstanding."

c.  "Your enthusiasm towards accomplishing projects and towards others on the team is fantastic."

d.  "You work great with all of the other members of the team.  Very thankful for this."

e.  "Your attitude has been terrific."

f.  On initiative: "This is where you really shine.  You've been excellent in asking for more[.]"

g.  "[Y]our work relations have been extraordinary[.]"

h.  "Your communication is extraordinary."

i.  "Keep doing exactly what you are doing."

20.     On or about June 5, 2020, Plaintiff received an Employee Performance Review from the Defendant, in which Defendant could rate Plaintiff as Excellent, Good, Fair, or Poor on 12 topics.

21.     In the review, Defendant rated Plaintiff as Excellent in 10/12 topics and Good in the remaining two.  The comments from Plaintiff's supervisor include:

a.  Work quality "[i]s also excellent.  This is paired with your excellent communication."

b.  "Communication is where you really shine."

c.  "You have been doing an excellent job on the team."

22.     In or about September 2020, Chad Lewis (Defendant's Vice President of Operations) told Plaintiff that she had earned a promotion to Project Manager, and that he planned to promote her soon.

23.     On or about October 5, 2020, Plaintiff disclosed to Defendant that she was pregnant.

24.     On or about October 15, 2020, Plaintiff received an Employee Performance Review from the Defendant, in which Defendant could rate Plaintiff as Exceptional, Good, Fair, or Needs Improvement on seven topics.

25.     In the review, Defendant rated Plaintiff as Exceptional in six out of the seven topics and Good in the remaining one.  Defendant gave Plaintiff the Employee Overall Ranking of 100% for the purposes of a bonus.

26.     In or about November 2020, Defendant promoted Plaintiff to Project Manager.

27.     However, Defendant did not provide Plaintiff with a pay raise related to this promotion and increase in workload and responsibilities.

28.     In or about October or November 2020, Matt Salas (Defendant's Director of Conversions Team, and Plaintiff's direct supervisor) said to the Conversions team: "I want another person on our team, but I don't want it to be a woman.  I think we have too much estrogen on this team already."

29.     Mr. Lewis said that he had a female friend who worked for Kiosk that would be amazing.

30.     Mr. Salas responded: "Okay.  I'll give her a look, but I *really* don't want to hire a woman."

31.     Beginning on or about October 31, 2020, Plaintiff began having complications with her pregnancy.  For example, she had severe pain in her abdomen.  When Plaintiff went to her doctor, he said that se likely had a kidney stone or a tear in her placenta, and that she should "take

it easy."  The doctor recommended that she work from home for two months, in November and

December 2020.  Plaintiff promptly informed Mr. Lewis of her medical condition and requested

the reasonable accommodation of working from home in November and December 2020.  Mr.

Lewis agreed and worked from home in November and December 2020.

32.     In or about October or November 2020, Mr. Salas stopped working for the

Defendant.

33.     At that time, Mr. Lewis became Plaintiff's supervisor.

34.     Mr. Salas' departure caused additional work for Plaintiff and other employees of

the Conversions team.

35.     In or about November 2020, Samantha Hagenstein (a Project Manager on the

Conversions team) and Plaintiff asked Mr. Lewis if Defendant could hire an additional employee

to the Conversions team, as Mr. Salas had left.

36.     In or about December 2020, Plaintiff asked Mr. Lewis for a raise.  She reminded

Mr. Lewis that she had received a promotion in November 2020, but no accompanying raise;

further, she had taken over much of Mr. Salas' work upon his departure.  Mr. Lewis responded

that he anticipated giving Plaintiff a raise in January 2021.

37.     In or about November and December 2020, Mr. Lewis and Breanna DiCarlo were

working together frequently and had started to exclude Plaintiff and Ms. Hagenstein from meetings

and decision-making.

38.     When Plaintiff explained to Mr. Lewis that she felt left-out out meetings and

decision-making, Mr. Lewis claimed that it was because she "need[s] to be in the office."

However, Mr. Lewis was aware that the reason Plaintiff was not in the office was because of her pregnancy and doctor-advised reasonable accommodations.

39. On or about January 18, 2021, was Plaintiff's first day back in the office after working from home. At the time, Plaintiff was six months pregnant.

40. On that day, Mr. Lewis, Ms. Hagenstein, and Plaintiff had a meeting to discuss project updates. At the meeting, they were discussing property damage that had recently occurred at one of Defendant's properties.

41. Mr. Lewis explained that the Defendant intended to install new, and more expensive, property at the same location without any plan for protecting it from further destruction. I asked why. Mr. Lewis responded: "I don't appreciate your negativity. What's your problem?" Plaintiff replied, "I don't have a problem. Just thought I should bring it up." Mr. Lewis said: "I don't like this bad attitude. You are on the bottom of the totem pole with performance."

42. Mr. Lewis stood up, walked over to Plaintiff, and raised his voice as he said this. Plaintiff began crying and asked him to stop berating her. Mr. Lewis refused to stop; he continued with a raised voice, insulting Plaintiff's purported attitude and performance. Ultimately, Plaintiff ran to the bathroom to collect herself.

43. On or about January 21, 2021, Mr. Lewis presented Plaintiff with a write-up. **The write-up specifically noted that one of the reasons for the write-up was "Talking about compensation with others[.]"**

44. The write-up included:

> "You have proven that you can be driven, motivated and have a great work ethic. . . . A bad attitude and underdeveloped skill set makes for a difficult situation to manage and thus, something I Need to consider very seriously. I want you to be successful and feel that I

have communicated that to you several times.  **I look forward to seeing your growth and you maximizing your potential both personally and professionally.**  For this to happen, I need your trust (less push back) and for you to establish a productive and positive attitude.  If this is something you are willing to do, I will continue to support you as much as I can to ensure you have the upmost opportunity at Red Dot.  If you are not willing, we will have to find an alternative solution.  **This is a big personal change and I understand that there is a lot at stake.**  Let's meet weekly to discuss our progress and how you are feeling about the current situation."

(emphasis added).

45.     In sum, Mr. Lewis seemed to believe that Plaintiff's attitude completely changed as she prepared for becoming a mother.  Mr. Lewis claimed that Plaintiff was perceived as having a bad attitude and being negative.

46.     In the meeting to provide the write-up, Mr. Lewis said: "We need you to sign this. You're doing great; this has nothing to do with performance.  It's just an attitude thing."  He proceeded to say, "If your attitude changes in 30 days, we'll talk about ripping this up."

47.     On or about February 11, 2021, Defendant issued Plaintiff a new offer of employment – this emphasized the fact that Defendant could "terminate the relationship at any time and for any reason."

48.     On or about February 15, 2021, Plaintiff asked Mr. Lewis if they could tear up the write-up.  Mr. Lewis responded: "No, it's too soon.  I want you to be accountable for your actions." Plaintiff asked Mr. Lewis if, moving forward, he could let her know about potential concerns.  He said of course and explained that being proactive with employee feedback was an area that he wanted to work on.

8

49.     On or about March 1, 2021 – when Plaintiff was nearly eight months pregnant – Mr. Lewis said to her, "I can't fire you yet legally.  I have to wait until eight weeks after you return from maternity leave."

50.     Ms. Hagenstein was floored by the comment and encouraged Plaintiff to report it to Human Resources.

51.     On or about March 10, 2021, Ms. DiCarlo invited Ms. Hagenstein and Plaintiff out to lunch.  At the lunch, Ms. DiCarlo said that Mr. Lewis had recently boasted to her that he was going to "start terminating people soon" and that "change was coming."

52.     On or about March 18, Plaintiff went into labor and thus began her maternity leave.

53.     While she was on maternity leave, Plaintiff could not put out of her mind that Mr. Lewis had repeatedly indicated his intent to terminate her due to her pregnancy and/or status as new mother.

54.     On or about May 6, 2021, Plaintiff emailed Barb Harris (Human Resources) asking for a meeting and, on or about May 8, 2021, Plaintiff reported to Ms. Harris about Mr. Lewis' discriminatory comments.

55.     Ms. Harris countered: "We're a no-fault state, we can fire you for any reason" and "We aren't trying to hire anyone for your position.  I don't have a reason to believe that he's trying to let you go."

56.     Ms. Harris then suggested, while Plaintiff was on maternity leave, that she take extra classes – which, to Plaintiff's knowledge, were not recommended to anyone else – to help improve Mr. Lewis's alleged perception about Plaintiff's abilities and/or dedication to her job.

57.     On or about June 21, 2021, Plaintiff returned to work following maternity leave.

58.     Unfortunately, Mr. Lewis's treatment of her continued to worsen.

59.     On or about June 22, 2021, Plaintiff met with Mr. Lewis, Ms. DiCarlo, and Ms. Hagenstein.  Mr. Lewis asked Ms. Zimmerman why a specific gate had been inoperable for seven months.  Plaintiff reminded Mr. Lewis that she had been on maternity leave for the prior three months and explained that if she not been on leave, it would have been operable within a reasonable period of time.  Unfortunately, the individual who was supposed to handle the issue while Plaintiff was on leave did not.  Nonetheless, Mr. Lewis scolded Plaintiff for the issue.

60.     On or about June 23, 2021, Plaintiff was at her desk packing up items to return to Amazon when Mr. Lewis walked by and said: "Are you packing up your desk?"  Plaintiff said no.  Mr. Lewis goaded: "Too bad!" and then followed up, "I like playing mind games with you."

61.     On or about June 30, 2021, Plaintiff was asked to meet with Mr. Lewis and Katie Wandtke (Head of People) at 3:00 pm.  At the meeting, Mr. Lewis said that Plaintiff had hurt her team's feelings when she said she would have handled fixing the gate more quickly if she had been at the office.  Plaintiff responded: "Well I would have.  I can't be held responsible for something that was handled while I was on leave."  Mr. Lewis said, "You no longer fit the culture here."

62.     Mr. Lewis fired Plaintiff at the meeting.

63.     At the time, Plaintiff had been back from maternity leave for approximately one and a half weeks.

64.     Unfortunately, stress caused by the termination impacted her milk supply, and she was soon no longer able to breastfeed.

## FIRST CLAIM FOR RELIEF
**(Gender and Pregnancy Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act of 1978 ("Title VII"))**

65.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

66.     Title VII prohibits adverse employment actions that are motivated by an employee's gender and prohibits an employer from discriminating against an employee based on pregnancy, childbirth, or related medical conditions.

67.     Plaintiff was a female who suffered from pregnancy-related medical conditions, and Plaintiff was therefore entitled to the protections of Title VII.

68.     Defendant terminated Plaintiff's employment.

69.     Defendant's termination of Plaintiff's employment was motivated by Plaintiff's gender, pregnancy, and pregnancy-related medical conditions; and was therefore discriminatory and in violation of Title VII.

70.     Defendant's actions denied Plaintiff equal employment opportunities by subjecting her to different terms and conditions of employment than her male and non-pregnant similarly situated coworkers.

71.     Defendant's unlawful and discriminatory practices complained of herein were intentional and done with malice or with reckless indifference to Plaintiff's federally-protected rights.

72.     As a direct and proximate result of Defendant's unlawful and discriminatory practices described herein, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such

general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act of 1978)**

73.     Plaintiff incorporates by reference all the above paragraphs as though set forth fully and separately herein.

74.     Plaintiff engaged in protected conduct when she: notified Defendants of her need for accommodation of a pregnancy-related medical condition (including but not limited to working from home); reported discriminatory conduct in May of 2021; used reasonable accommodations for her pregnancy-related medical condition; and requested medical leave for her pregnancy-related medical condition.  Plaintiff further engaged in protected conduct when she notified Defendant of her need for and took maternity leave.

75.     Defendant retaliated against Plaintiff and subjected Plaintiff to less favorable terms and conditions of employment because of Plaintiff's above-described protected conduct by subjecting Plaintiff to consequences of the type that would tend to discourage similarly situated employees from engaging in protected activity (including issuing Plaintiff a write-up and terminating Plaintiff's employment).

76.     Defendant engaged in the above-described retaliatory practices with malice or with reckless indifference to Plaintiff's federally-protected rights.

77.     As a direct and proximate result of Defendant's above-described retaliatory actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering,

embarrassment, and inconvenience; and Plaintiff is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## THIRD CLAIM FOR RELIEF
### (Retaliation in Violation of the Pregnant Workers Fairness Act, § C.R.S. 24-34-402.3)

78.     Plaintiff incorporates by reference all the above paragraphs as though set forth fully and separately herein.

79.     Pursuant to C.R.S. § 24-34-402.3(1)(a)(I), employers shall "provide reasonable accommodations to perform the essential functions of the job to … an employee for health conditions related to pregnancy or the physical recovery from childbirth, if the … employee requests the reasonable accommodations, unless the accommodation would impose an undue hardship on the employer's business[.]"

80.     Pursuant to C.R.S. § 24-34-402.3(1)(a)(II), employers shall "[n]ot take adverse action against an employee who requests or uses a reasonable accommodation related to pregnancy, physical recovery from childbirth, or a related condition[.]"

81.     Defendant's termination of Plaintiff's employment is an action that a reasonable employee would have found to be materially adverse.

82.     Defendant terminated Plaintiff and subjected Plaintiff to materially adverse job consequences because Plaintiff requested and/or used reasonable accommodations related to pregnancy, or a related condition.

83.     Defendant's retaliatory termination of Plaintiff constitutes a discriminatory or unfair employment practice pursuant to C.R.S. § 24-34-402.3(5).

84.     Defendant engaged in the above-described discriminatory or unfair employment practices with malice or with reckless indifference to Plaintiff's rights under C.R.S. § 24-34-402.3.

Plaintiff is therefore entitled to an award of punitive damages in an amount sufficient to punish Defendant or to deter Defendant and other companies from like conduct in the future.

85.     As a direct and proximate result of Defendant's above-described discriminatory or unfair employment practices, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and Plaintiff is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Wage Transparency Act, C.R.S. § 24-34-402(1)(i) ("WTA"))**

86.     Plaintiff incorporates by reference all the above paragraphs as though set forth fully and separately herein.

87.     Defendant meets the definition of an employer under the Colorado Anti-Discrimination Act.

88.     Under the WTA, C.R.S. § 24-34-402(1)(i), it is a discriminatory or unfair employment practice:

> . . . [F]or an employer to discharge, discipline, discriminate against, coerce, intimidate, threaten, or interfere with any employee or other person because the employee inquired about, disclosed, compared, or otherwise discussed the employee's wages[.]

89.     Here, Plaintiff inquired about, disclosed, compared, or otherwise discussed the employee's wages.

90.     Plaintiff was scolded, threatened, and issued a write-up by the Defendant for discussing her wages.

91.     Surprisingly, Defendant explicitly said that a reason for issuing Plaintiff the write-up was "Talking about compensation with others[.]"

92.     Because Plaintiff discussed compensation with others, she was issued a write-up and discharged by the Defendant.

93.     Plaintiff was terminated because of her inquiries and discussions about her wages.

94.     Defendant's discipline of; discrimination against; attempts to intimidate, threaten, and interfere with; and termination of Plaintiff for inquiring about, disclosing, comparing, or otherwise discussing her wages constitutes discriminatory or unfair employment practices pursuant to C.R.S. § 24-34-402(1)(i).

95.     Defendant violated the Colorado Anti-Discrimination Act's Wage Transparency Act, C.R.S. § 24-34-402(1)(i) by discharging Plaintiff for Plaintiff's lawful inquiries and discussion about her compensation.

96.     Defendant's above-described conduct was intentional.

97.     Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's legally-protected rights.

98.     As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**FIFTH CLAIM FOR RELIEF**
**(Wrongful Termination in Violation of Public Policy)**

99.     Plaintiff incorporates by reference all the above paragraphs as though set forth fully and separately herein.

15

100.    Plaintiff is granted the specific right to inquire about, disclose, compare, or otherwise discuss wage information under the Wage Transparency Act.

101.    Colorado law expresses a clear public policy in favor of wage transparency.  In 2008, Colorado enacted the Wage Transparency Act. (SB 08-122, Ch. 290, p. 524).

102.    Wage transparency also underpins Colorado's clearly expressed public policy against wage discrimination.  C.R.S. § 8-5-102.  Wage transparency allows employees to share their wages and discover potential discrimination.  In 2019, Colorado further expressed its public policy and enacted the Equal Pay for Equal Work Act (SB 19-085), which clarified that Colorado law prohibits an employer from terminating an employee for discussing her wages.

103.    Plaintiff exercised an important job-related right when she discussed her wages.

104.    As a result of Plaintiff exercising an important job-related right, Defendant terminated her.

105.    It is a violation of public policy in Colorado for an employer to terminate an employee for discussing a legitimate compensation dispute with his employer.  *See*, *Hoyt v. Target Corp.*, 981 P.2d 188, 192-93 (Colo. App. 2006).

106.    Defendant violated Colorado public policy when it terminated Plaintiff.

107.    As a direct and proximate result of Respondent's wrongful termination of Ms. Zimmerman, she has sustained damages, including without limitation past and future wage and benefit losses, reputational damages, emotional distress, inconvenience, humiliation, and mental suffering.

16

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants and order the following relief as allowed by law:

A.      Actual economic damages, as established at trial;

B.      Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, and garden-variety emotional distress, pain, inconvenience, mental anguish, and humiliation;

C.      Punitive damages, as permitted by law;

D.      Attorneys' fees and the costs of this action, as permitted by law;

E.      Statutory pre-judgment and post-judgment interest at the highest lawful rate; and

F.      Such further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 18th day of July, 2022.

**HKM Employment Attorneys, LLP**

By: */s/ Jesse K. Fishman*
Jesse K. Fishman (44807)
Claire E. Hunter (39504)
HKM Employment Attorneys, LLP
730 17th Street, Suite 750
Denver, CO 80202
jfishman@hkm.com
chunter@hkm.com
*Attorneys for Plaintiff Alysha Zimmerman*

17